**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation
Washington, D.C. 20530

July 27, 2026

FILED ELECTRONICALLY BY ECF
United States Court of Appeals for the Third Circuit
James A. Byrne United States Courthouse
601 Market Street
Philadelphia, PA 19106

Re: *Josefina Doe, et al. v. U.S. Department of Homeland Security, et al.*, No. 25-1628 — Appellants' Supplemental Letter Brief

Dear Members of the Court:

Assuming without conceding that ICE's Refusal Policy burdens a cognizable constitutional right, *Bell v. Wolfish* governs whether that burden is justified by a legitimate, nonpunitive governmental objective and is not excessive; *Procunier v. Martinez* prohibits unjustified obstruction of legal representation or court access; and *Turner v. Safley* identifies reasonableness factors that inform the inquiry. Applying that integrated standard here, Appellees did not establish that the Refusal Policy unjustifiably obstructed access or imposed an excessive burden. The record supports ICE's decision to reserve finite video capacity for federal detention functions and to address state-court appearances through the established writ process. Appellants maintain the arguments in their opening and reply briefs that would preclude the Court from reaching these balancing questions.

1. *Bell*'s civil-detainee framework governs, with *Martinez* supplying the attorney- and court-access principle and *Turner* informing the inquiry.

Because immigration detainees are entitled to the same due-process protections as pretrial detainees, *Bell* supplies the governing framework here. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 325–26 (3d Cir. 2020). Under *Bell*, a restriction does not amount to punishment if it is reasonably related to a legitimate, nonpunitive governmental objective and is not excessive in relation to that objective. *Bell v. Wolfish*, 441 U.S. 520, 538–40 (1979). Legitimate objectives include maintaining security and order, effectively managing the facility and its resources, and carrying out immigration-detention functions. *Id.* at 540; *Turner v. Safley*, 482 U.S. 78, 90 (1987); *Hope*, 972 F.3d at 327. Retribution, deterrence, and other punitive purposes are not legitimate nonpunitive objectives. *Bell*, 441 U.S. at 538–39 & n.20. *Bell* requires any asserted infringement of an otherwise applicable constitutional guarantee to be evaluated in light of legitimate institutional needs. *Id.* at 546–47. Courts therefore owe appropriate deference to detention officials' operational judgments absent substantial record evidence that their response is exaggerated. *Id.* at 547–48; *Hope*, 972 F.3d at 326–27.

*Bell*'s status-based framework must be applied to the particular right asserted. Here, *Martinez* supplies the right-specific principle for legal representation and court access. Although *Martinez* used a more demanding standard for prisoner correspondence, its separate access holding stated that practices that "unjustifiably obstruct" professional representation or court access are invalid. *Procunier v. Martinez*, 416 U.S. 396, 413–14, 419 (1974). Under that principle, the extent of the burden must be weighed against legitimate institutional interests and practical administrative considerations. *Id.* at 420. The availability of less burdensome alternatives may inform whether the asserted obstruction is justified, but administrators need not adopt every proposal that might facilitate access. *Id.*

*Turner*, which concerned convicted prisoners, identifies practical considerations that guide the application of *Bell*'s framework and *Martinez*'s access principle here. Specifically, courts consider the restriction's connection to a legitimate, neutral objective; alternative means of exercising the asserted right; the impact of accommodation on institutional staff, other detainees, and resource allocation; and whether an obvious, easy alternative would fully accommodate the right at de minimis cost to valid institutional interests. *Turner*, 482 U.S. at 89–91. These factors inform *Bell*'s reasonable-relationship and excessiveness inquiry and the weighing of the asserted access burden against legitimate institutional interests under *Martinez*.

Together, *Bell* and *Martinez* supply the governing standard. Assuming a cognizable burden, the Court should determine whether the Refusal Policy unjustifiably obstructs legal representation or court access by assessing whether the policy is reasonably related to legitimate, neutral, nonpunitive custodial or administrative interests and whether the asserted burden is excessive in relation to those interests. *Turner*'s practical factors inform that inquiry, which should be conducted with appropriate deference to ICE's operational judgment.

2. The preliminary-injunction record does not establish that the Refusal Policy was unjustified or excessive.

The preliminary-injunction record supports ICE's institutional choice to reserve finite secure video facilities and associated staff principally for immigration-court hearings, asylum functions, and confidential attorney access. ICE Assistant Field Office Director Francis Kemp declared that Moshannon Valley Processing Center ("MVPC") had four virtual courtrooms for immigration hearings during business hours Monday through Friday and 31 privacy booths for asylum interviews or hearings and virtual attorney visitation. SA469–70. Those facts supplied record support for the interest that Defendants expressly articulated in opposing preliminary relief: prioritizing MVPC's limited staff and video facilities for immigration adjudication, asylum functions, and attorney access rather than assuming an open-ended responsibility to coordinate proceedings across numerous New Jersey courts. A3–4, 14–15; SSA012, 036, 043, 048. Institutional administration and allocation of finite staff and facilities are legitimate, neutral, nonpunitive interests, and the identified uses supply a rational connection between those interests and ICE's general refusal line. *Bell*, 441 U.S. at 538–40, 547–48; *Hope*, 972 F.3d at 327. The relevant question under *Bell* is not whether remote appearances were technologically impossible, but rather whether ICE's allocation judgment was rational and not excessive. *Bell*, 441 U.S. at 538–40. ICE rationally chose to reserve its finite video capacity principally for functions directly connected to federal detention, while addressing state-court appearances through the traditional inter-sovereign production process. *Ponzi v. Fessenden*, 258 U.S. 254, 259–62 (1922).

That inter-sovereign framework also bears on the alternative-means inquiry. The challenged policy restricts remote production for state-court proceedings; it does not restrict attorney-client communication or foreclose physical production through the writ process. A4, 15; SA469; SSA012. Under that process, a state or local court may issue a writ for a detainee's appearance, after which ICE approval and Field Office coordination follow, and the requesting law-enforcement agency generally arranges transportation. SSA012; A14–15. The existence of that formal alternative bears on reasonableness under *Turner*, while *Martinez* confirms that administrators need not adopt every proposed accommodation. *Turner*, 482 U.S. at 90; *Martinez*, 416 U.S. at 420.

*Turner* indicates that the institutional impact of the requested accommodation should be assessed in the aggregate. 482 U.S. at 90. Although one remote appearance might impose little cost, a recurring obligation to facilitate state-court proceedings would require ICE to coordinate hearings across numerous detainees, cases, and courts. The record reflected that cumulative-demand concern: the complaint quotes GEO employee Becky Brown as stating that MVPC lacked resources to facilitate the many hearings of residents with open criminal cases, and Defendants likewise identified the potential demands of multiple state-court calendars. Compl. ¶ 57(p); A15; SSA043. The common-area phones and tablets did not dispel that concern because their presence did not establish unused secure capacity interchangeable with MVPC's virtual courtrooms or privacy booths. SA468–70. Given the absence of quantified evidence concerning anticipated hearing volume, associated staffing and scheduling demands, device utilization, or resulting displacement of immigration hearings, asylum functions, or attorney access, Appellees did not establish that the common-area phones and tablets supplied an obvious classwide alternative available at de minimis institutional cost. *See Turner*, 482 U.S. at 90–91.

The evidence that MVPC accommodated family-court hearings and several criminal proceedings likewise did not undermine the rationality of ICE's general resource-allocation policy. A15; SA278. Appellees did not show that those proceedings were comparable in frequency, duration, staffing needs, scheduling demands, or aggregate institutional impact to recurring classwide criminal-court production, or that the accommodations reflected unused capacity available for repeated criminal calendars. A15; SA278. Those isolated accommodations therefore did not supply substantial evidence that ICE had exaggerated its response to the aggregate administrative and resource concerns that it identified. *See Bell*, 441 U.S. at 548.

The factual postures of *Martinez*, *Benjamin v. Fraser*, and *Cobb v. Aytch* confirm why Appellees did not establish unjustified obstruction here. *Martinez* involved a direct, absolute prohibition on attorney-designated law students and legal paraprofessionals interviewing prisoners. 416 U.S. at 419. Here, by contrast, the challenged policy does not restrict attorney-client consultation. A4; SA469. Rather, the dispute concerns whether ICE must provide staffing and technology to facilitate another sovereign's proceedings. A3–4; SSA043.

*Benjamin* likewise rested on a developed record and direct, documented interference with attorney-client consultation. After five days of hearings concerning jail conditions, the district court found that attorneys routinely waited between forty-five minutes and two hours or longer to meet detained clients, which caused attorneys to shorten or abandon necessary consultations. *Benjamin v. Fraser*, 264 F.3d 175, 178–80 (2d Cir. 2001). Detainees were moved for family visits during inmate counts even though attorney visits were suspended, and the Department identified no security or administrative justification for that differential treatment. *Id.* at 179–80. The plaintiffs also identified concrete measures that would alleviate the interference at minimal institutional cost. *Id.* at 180, 187–88. Unlike the practices challenged in *Benjamin*, the Refusal

Policy does not restrict attorney-client consultation. A4; SA469. The dispute instead concerns whether ICE, as a federal custodian, must devote staff and technology to facilitate New Jersey criminal proceedings. A3–4, 15. Defendants articulated an immigration-mission and resource-allocation rationale; the record identified competing immigration, asylum, and attorney-access uses; and Appellees did not establish that the isolated criminal accommodations were operationally comparable to recurring classwide production. A3–4, 15; SA469–70.

*Cobb* involved a different form of direct interference but, like *Benjamin*, rested on extensive factual findings. Transfers within Pennsylvania's criminal-justice system deprived certain detainees of essential pretrial interviews, caused missed appearances and continuances, prolonged some detainees' confinement beyond their eventual sentences, substantially interfered with access to counsel, and impaired access to potential witnesses. *Cobb v. Aytch*, 643 F.2d 946, 951, 957, 960 (3d Cir. 1981) (en banc). Here, by contrast, Appellees seek to require a federal custodian to facilitate another sovereign's proceedings remotely, against the background of an established writ process. A14–15; SSA012. Unlike the developed record in *Cobb*, the preliminary-injunction record contained no comparable evidence testing the cost or operational feasibility of recurring classwide remote production. Those factual and institutional differences explain why the proof establishing unjustified obstruction in *Benjamin* and *Cobb* is absent here and why Appellees did not carry their preliminary-injunction burden.

That evidentiary distinction matters because Appellees bore the burden to establish likely success under the governing standard. *Hope*, 972 F.3d at 319–20. Defendants, meanwhile, identified a legitimate, nonpunitive rationale for the Refusal Policy: preserving MVPC's limited virtual courtrooms, privacy booths, and available staff for immigration adjudication, asylum functions, and virtual attorney visitation, with state-court production instead addressed through the writ process. A3–4, 14–15; SA469–70; SSA012. Appellees did not establish that this allocation "unjustifiably obstruct[ed]" access, *Martinez*, 416 U.S. at 419–20; that any resulting burden was excessive in relation to ICE's legitimate interests, *Bell*, 441 U.S. at 538–39; or that classwide remote production was an obvious alternative that would fully accommodate the asserted right at de minimis institutional cost, *Turner*, 482 U.S. at 90–91.

Appellants continue to request reversal and remand with instructions to dismiss for lack of jurisdiction, for the reasons stated in their opening and reply briefs. If the Court reaches the balancing question, it should reverse the preliminary-injunction order because Appellees did not establish likely success under the integrated *Bell/Martinez* framework. At minimum, if application of that framework requires operational facts absent from the preliminary-injunction record, the Court should vacate and remand for the district court to apply the correct standard on an appropriately developed record.

Respectfully Submitted,

*/s/ Julian M. Kurz*
Julian M. Kurz
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation

*Counsel for Defendants-Appellants*